UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

TAMMY L. BASS,

                         Plaintiff,

        -against-

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

                      Defendant.
--------------------------------------------------------------X

**OPINION AND ORDER**

16 Civ. 6721 (JCM)

Plaintiff Tammy L. Bass ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§ 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for Supplemental Security Income ("SSI")

benefits, finding her not disabled within the meaning of the Social Security Act. (Docket No. 1).

Presently before this Court are (1) Plaintiff's motion, pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure, for judgment on the pleadings, (Docket No. 9), and (2) the Commissioner's

cross-motion for judgment on the pleadings, (Docket No. 17). For the reasons below, Plaintiff's

motion is granted and the Commissioner's cross-motion is denied.[2] The Court remands the case

to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative

proceedings consistent with this decision.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security and is substituted for former Acting Commissioner Carolyn W. Colvin as the Defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] This action is before me for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 16).

# I. BACKGROUND

Plaintiff was born on October 17, 1965. (R.[3] 293). She applied for SSI benefits on June 30, 2011. (R. 254–63). The Social Security Administration ("SSA") denied her application, (R. 139–42), and she requested a hearing before an Administrative Law Judge ("ALJ"), (R. 143). ALJ Michael Friedman conducted a hearing on June 7, 2012. (R. 98–115). In a decision dated July 19, 2012, ALJ Friedman found Plaintiff not disabled. (R. 118–33). Plaintiff requested that the Appeals Council review the ALJ's decision. (R. 191–92). The Appeals Council granted her request, vacated the ALJ's decision and remanded her claim for further administrative proceedings. (R. 134–37). ALJ Friedman conducted a second hearing on June 26, 2014. (R. 44–96). In a decision dated September 3, 2014, ALJ Friedman again found Plaintiff not disabled. (R. 26–43). Plaintiff again requested review of the ALJ's decision by the Appeals Council. (R. 20–25). On April 25, 2016, the Appeals Council denied review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1–6). Plaintiff appealed the Commissioner's decision by filing the present action on August 25, 2016, contending that ALJ Friedman's decision was contrary to law and not supported by substantial evidence. (Docket No. 1). The relevant period at issue is from the June 30, 2011 SSI application date through the Commissioner's September 3, 2014 final decision.

## A. Plaintiff's Medical Treatment History

As summarized below, the administrative record reflects medical treatment Plaintiff received from multiple sources.[4]

---

[3] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed in this action on December 5, 2016. (Docket No. 8).

[4] In her brief, Plaintiff states that she "does not dispute the ALJ's findings regarding her physical impairments." (Docket No. 10 at 2 n.2). Therefore, the following summary focuses on Plaintiff's psychiatric history.

## 1. Central New York Psychiatric Center

In 2010 and 2011, while incarcerated for criminal sale of a controlled substance, Plaintiff received treatment for depression and anxiety through the Central New York Psychiatric Center. (R. 376–96). At initial psychiatric evaluations on July 14 and 15, 2010, Plaintiff denied any history of self-harm or suicide attempts. (R. 378, 392). She reported that she felt anxious and depressed and had experienced multiple deaths in her family, including the deaths of her parents and two half-brothers, and had witnessed her girlfriend commit suicide. (R. 378, 389, 393). However, she did not have any plan for suicide, and she did not experience flashbacks, nightmares, insomnia, confusion, memory loss or gaps, self-injury, extreme fearfulness or terror, exaggerated startle response, hyper-vigilance or dissociations. (R. 380, 389). Plaintiff's conditions were diagnosed as major depressive disorder, single episode; generalized anxiety disorder; cocaine dependence; and borderline personality disorder. (R. 376, 378, 383, 388, 389, 390, 392).

A discharge summary completed on May 23, 2011, and signed by licensed clinical social worker ("LCSW") M. Schell and psychiatrist Dr. Jacob Widroff, noted that Plaintiff was future oriented and she denied suicidal gestures, thoughts or plan. (R. 393). Plaintiff's mood was mildly anxious. She had been trying to manage her symptoms with therapy, and she did not want to take medication. (R. 395). She had no behavioral abnormalities. (R. 395). Her speech was clear, understandable and normal. (R. 395). She reported that her daily living skills were good, and she was independent with self-care and personal hygiene. (R. 396). She could perform household chores, including doing laundry and cooking. (R. 396). Plaintiff described her memory and concentration as "ok." (R. 396). She stated that she did not have difficulty socializing and was not afraid to meet new people. (R. 396). She learned coping skills, did not

3

have difficulty traveling or using public transportation, and felt comfortable asking for assistance when needed. (R. 396).

**2. Emma L. Bowen Community Service Center**

After Plaintiff was released from prison, her parole officer referred her for treatment at the Emma L. Bowen Community Service Center, also known as Upper Manhattan Mental Health Center, Inc. (R. 398, 401). The record contains a "Psychosocial History" dated July 28, 2011, (R. 400–07), and a "Psychiatric Assessment" dated August 26, 2011, (R. 398–400). Plaintiff reported that she had no history of inpatient psychiatric treatment, but she had received outpatient mental health treatment. (R. 398, 401, 405). She denied past suicide attempts or gestures, and she denied suicidal or homicidal thoughts. (R. 398, 406, 408). She reported that she experienced unspecified auditory and visual hallucinations. (R. 406). On mental status evaluation, Plaintiff was calm, friendly and cooperative. (R. 399, 404). Her speech was audible and spontaneous. (R. 399). Her affect was blunted and her mood was nervous. (R. 399). Plaintiff's thought process was coherent and goal-directed. (R. 399). Her sensorium was clear, and she was oriented to person, place and time. (R. 406). Her attention, insight and judgment were fair, though she was easily distracted, forgetful, and had poor impulse control. (R. 400, 406–07). The diagnosis was depressive disorder, not otherwise specified, and status post substance abuse. (R. 400). Her global assessment of functioning ("GAF") was 60. (R. 400).

Plaintiff was admitted for treatment at Upper Manhattan Mental Health Center on September 1, 2011, where she saw LCSW Samuel Cortes weekly for therapy and psychiatrist Dr. Antoine Pierre monthly. (R. 449). LCSW Cortes completed a "Medical Source Statement Questionnaire" on April 4, 2012, rating Plaintiff's mental abilities to perform work in a number of categories. (R. 449–53). He stated that Plaintiff was seriously limited, but not precluded in

her abilities to (1) sustain an ordinary routine without special supervision, and (2) accept instructions and respond appropriately to criticism from supervisors and respond appropriately to changes in the work setting. Plaintiff was unable to meet competitive standards in her abilities to (1) maintain attention and concentration for a two hour segment; (2) work in coordination with and proximity with others without being distracted by them; and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and get along with co-workers and peers without distracting them. Plaintiff had no useful ability to deal with normal work stress. (R. 451). LCSW Cortes also checked a box stating that Plaintiff had "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (R. 452). He anticipated that Plaintiff would be absent from work more than four days per month. (R. 452).

Dr. Pierre completed a psychiatric evaluation update in September 2012, one year after Plaintiff started treatment. (R. 505–07). She was irritable with mood swings, labile affect, and paranoid ideas. (R. 506). She reported auditory and visual hallucinations. (R. 506). She had poor impulse control and limited insight and judgment. (R. 507). Her GAF score was 60. (R. 507). Dr. Pierre's diagnosis was schizoaffective disorder and status post multiple substances abuse. (R. 507). He recommended medication adjustment as needed. (R. 507).

LCSW Cortes completed a treatment plan review on August 26, 2013, noting that Plaintiff was not compliant with therapy appointments. (R. 493, 499). Plaintiff grieved the loss of her mother and siblings and separation from her partner. (R. 494). Her GAF score was still 60. (R. 492). LCSW Cortes completed treatment plan reviews, cosigned by Dr. Antoine Pierre,

on November 26, 2013, (R. 570–78), and February 26, 2014, (R. 561–69). Plaintiff had no suicidal thoughts. (R. 561, 570). She had moderate depression and attended appointments sporadically. (R. 562, 571). She had many losses in her life, most recently her sister, and she was mourning her death. (R. 563, 570). The diagnoses were schizoaffective affective disorder and polysubstance dependence. (R. 561, 570).

On October 23, 2013, LCSW Cortes completed a "Psychiatric/Psychological Impairment Questionnaire," which Dr. Pierre later co-signed at the request of Plaintiff's attorney. (R. 587–95). Plaintiff's GAF score was 60. (R. 588). LCSW Cortes indicated that Plaintiff had moderate limitations in her ability to (1) remember locations and work-like procedures; (2) understand, remember and carry out detailed instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (4) interact with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) respond appropriately to changes in a work setting. (R. 591–93). LCSW Cortes also indicated that Plaintiff had marked limitations in her abilities (1) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (2) to travel in unfamiliar places or use public transportation. (R. 592–93). Plaintiff could tolerate low work stress. (R. 594). LCSW Cortes stated that it was "unknown" how often Plaintiff would likely be absent from work. (R. 595).

In July 2014, Dr. Pierre checked a box on a form opining that Plaintiff was disabled without consideration of drug or alcohol abuse. (R. 621). Dr. Pierre opined that drug or alcohol was not a material cause of disability because Plaintiff was not currently using drugs or alcohol. (*Id.*)

Following the ALJ's decision, Plaintiff supplemented the record to include two additional medical records. (R. 340, 704–12). Dr. Pierre completed mental impairment questionnaires in January and March 2016, noting that his most recent examinations of Plaintiff were December 23, 2015 and March 16, 2016, respectively. (R. 704–12). In these questionnaires, Dr. Pierre rated the degree of Plaintiff's limitations in four categories: (1) understanding and memory; (2) concentration and persistence; (3) social interactions; and (4) adaptation. (R. 706, 711). In his January 2016 assessment, Dr. Pierre generally rated Plaintiff's limitations in these areas as moderate–to–marked and marked. (R. 706). In March 2016, Dr. Pierre noted that Plaintiff had "none-to-mild" limitation in understanding and remembering one-to-two step instructions. (R. 711). In the other areas, he rated Plaintiff's limitations as moderate, moderate–to–marked and marked. (R. 711). On average, Dr. Pierre stated that Plaintiff would be absent from work due to her impairments two to three times per month. (R. 707, 712).

### 3. Plaintiff's Primary Care Provider

Treatment notes from Plaintiff's primary care provider, Dr. Delphine Taylor, dated August 23, 2011, stated that Plaintiff was previously taking medications for a panic disorder, but she stopped taking them about four years prior and had not seen a psychiatrist for about four years. (R. 628). Plaintiff's mother and two brothers had died in the last year, which had increased her symptoms of panic. (R. 628). Plaintiff was able to control her symptoms by recognizing them. (R. 628). She had an appointment to see a therapist and a psychiatrist at Upper Manhattan Mental Health Center the next day to resume treatment. (R. 628–29).

Plaintiff returned to Dr. Taylor about four months later on December 31, 2011. (R. 629). She had reestablished mental health treatment and took medications again. (R. 629). She stated that her feelings of panic and mood issues were improving. (R. 629). When Plaintiff saw Dr.

Taylor in June 2012, Plaintiff stated that she had stopped taking her medications for two months, but began taking them again two weeks prior. (R. 633). Plaintiff reported having a panic attack, but she was able to calm herself. (R. 633). Dr. Taylor observed that Plaintiff appeared well, was smiling and was "slightly jumpy." (R. 633). Plaintiff did not see Dr. Taylor for follow-up until November 30, 2012. (R. 649). Her mood was improving. (R. 649). At an August 2013 visit, Plaintiff denied anxiety. (R. 650).

### 4. Emergency Department/Urgent Care

Plaintiff visited an emergency department or an urgent care facility in June 2011 complaining of low back pain and a painful lump to her umbilical area (an umbilical hernia). (R. 346, repeated R. 622). Plaintiff denied having thoughts of suicide. (R. 347, repeated R. 623).

Plaintiff visited an emergency department or an urgent care facility twice in October 2013, once for upper respiratory or flu-like symptoms and once for chest tightness and shortness of breath. (R. 536, 546). Plaintiff denied any recent thoughts of suicide and her mood and affect were normal. (R. 539, 552, 669, 679, 687).

### B. Consultative Evaluations

The record contains consultative evaluations by an examining psychologist, an examining medical doctor, and a non-examining psychologist.

### 1. Consultative Examiner Dmitri Bougakov, Ph.D.

Psychologist Dimitri Bougakov performed a psychiatric evaluation for the State Division of Disability Determinations on August 29, 2011. (R. 410–13). On mental status examination, Dr. Bougakov observed that Plaintiff was adequately groomed. (R. 411). She was cooperative, related adequately, and had appropriate eye contact. (R. 411). Her thoughts were coherent and goal-directed, and her sensorium was clear. (R. 411). Her affect was somewhat anxious and her

mood was neutral. (R. 411). Plaintiff's attention, concentration and memory were mildly impaired. (R. 411). Her cognitive functioning was average to below average. (R. 412). Her insight and judgment were fair. (R. 412). Dr. Bougakov diagnosed depressive and anxiety disorder, not otherwise specified. (R. 412). Dr. Bougakov stated that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, and maintain a good schedule. (R. 412). Plaintiff was "somewhat limited" in her ability to learn new tasks and perform complex tasks. (R. 412). She was able to make appropriate decisions, relate adequately with others, and deal with stress on a limited basis. (R. 412). Dr. Bougakov concluded that Plaintiff's psychiatric problems and possible cognitive problems did not interfere with her ability to function on a daily basis. (R. 412).

## 2. Consultative Examiner Sharon Reran, M.D.

Dr. Sharon Reran performed an internal medicine examination of Plaintiff for the Division of Disability Determination on August 29, 2011. (R. 414–17). Although Dr. Reran's report primarily addressed Plaintiff's physical condition, Dr. Reran also opined that claimant had mild limitations with activities of daily living secondary to her psychological state. (R. 417).

## 3. Non-Examining Consultant L. Meade

On September 30, 2011, psychologist L. Meade reviewed available medical evidence and rated Plaintiff's functioning in 20 areas under the broad categories of (1) understanding and memory; (2) concentration and persistence; (3) social interactions; and (4) adaptation. (R. 439–40). He opined that Plaintiff was not significantly limited in her ability to understand, remember and carry out very short and simple instructions. (R. 439). Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods. (R. 439). She was not significantly limited with regard to her ability to get along with coworkers or peers without

distracting them or exhibiting behavior extremes, and she was moderately limited in her ability to interact appropriately with the general public. (R. 440). Dr. Meade stated that, based on a review of the file, Plaintiff's allegations regarding her symptoms were not supported to the extent alleged and therefore were only partially credible. (R. 441).

## C. Plaintiff's Testimony

Plaintiff testified at both the hearing on June 26, 2014, (R. 46–84), and the hearing on June 7, 2012, (R. 101–14). At each hearing, she was represented by a non-attorney representative. (R. 46, 100, 153, 196). Plaintiff testified that she has been unable to work because of anxiety, mood swings and depression. (R. 104). She experiences anxiety and feels uncomfortable and paranoid being around people. (R. 54, 63–64, 104, 107). She also hears voices and has visual hallucinations. (R. 72–74, 110–11). She reported severe depression with difficulty getting out of bed and avoidance of going outside at times. (R. 67, 112–13). She testified that she completed school through the ninth grade. (R. 108). She worked as a cook for about six months and as a park maintenance worker. (R. 48–50, 419). She lived in an apartment with her sister. (R. 46–47). She visited her other sister and had a good relationship with her family. (R. 56, 412). She testified that she shopped and helped clean her apartment. (R. 55). She took care of her puppy, including taking him for short walks. (R. 56). She stated that she could not use the subway because of anxiety, particularly when she was in crowded places, but the bus was not as bad. (R. 62).

## D. Vocational Expert Testimony

The ALJ asked a vocational expert ("VE") to consider a hypothetical individual who could perform light work, which involved simple, routine and repetitive tasks, only occasional contact with coworkers and supervisors, and contact only two to four times a day with the public.

(R. 39, 77). The VE identified light unskilled jobs existing in significant numbers in the national economy that this individual could perform, such as small parts assembler, mail clerk and routing clerk. (R. 77–78).

### E. ALJ Friedman's September 3, 2014 Decision

In his decision dated September 3, 2014, (R. 26–39), ALJ Friedman followed the five-step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. § 416.920. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since she applied for SSI. (R. 31). At step two, the ALJ found that Plaintiff had the following severe mental impairments: anxiety disorder, not otherwise specified; borderline personality disorder; and post-traumatic stress disorder. (R. 31).

At step three, the ALJ found that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one the of the impairments set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. 32–33). The ALJ found that Plaintiff had (1) mild-to-moderate restriction in activities of daily living; (2) moderate difficulties with social functioning, concentration, persistence and pace; and (3) no history of episodes of decompensation of extended duration. (R. 32–33).

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following additional limitations: (1) she was limited to simple, routine and repetitive tasks, and (2) she could have only occasional interaction with coworkers and supervisors, and contact with the public only two to four times a day. (R. 33). In making the RFC determination, the ALJ accorded "strong weight" to the opinions of Dr. Bougakov "based on the consistency of his opinions with his findings during his evaluation, his experience and expertise as a psychiatrist, and his familiarity with SSA Rules and Regulations." (R. 37). The

ALJ also accorded weight to the opinions of Dr. Widroff and state examiner L. Meade and "some weight" to the opinions of Dr. Reran regarding claimant's mild limitation with activities of daily living. (R. 35–36, 39).

At step four, the ALJ found that Plaintiff had no past relevant work. (R. 38). The ALJ therefore proceeded to the fifth and final step of the sequential evaluation process. (R. 38–39). At step five, the ALJ applied Medical-Vocational Rule 202.17 as a framework and relied on the VE's testimony to find that Plaintiff could perform work that exists in significant numbers in the national economy (e.g., as an assembler of small products, a mail clerk and a routing clerk), and that she was therefore not disabled. (R. 38–39).

## II. DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds. (Docket No. 10). First, Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence, particularly the October 23, 2013 Impairment Questionnaire completed by LCSW Cortes and later co-signed by Dr. Pierre. (*Id.* at 9–15). Second, Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's credibility. (*Id.* at 16–19). Conversely, the Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence and based upon correct legal standards. (Docket No. 18).

## A. Legal Standards

A claimant is disabled if she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C.

§ 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant

is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her past
> relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117,

120 (2d Cir. 2008); 20 C.F.R. § 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "and

bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176

(quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to

show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*,

683 F.3d 443, 445 (2d Cir. 2012).

## B.  Standard of Review

When reviewing an appeal from a denial of SSI benefits, the Court's review is "limited to

determining whether the SSA's conclusions were supported by substantial evidence in the record

and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013)

(quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).

The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the

claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration

in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).  However, where the

proper legal standards have not been applied and "might have affected the disposition of the

case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.* "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C. The Treating Source Rule

In determining an applicant's RFC, the ALJ must apply the so-called "treating source rule," also known as the "treating physician rule," which requires the ALJ to accord controlling weight to the opinions of "treating sources" when those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2).[5] If there is substantial evidence in the record that contradicts or questions the credibility of a treating source's assessment, the ALJ may give that treating source's opinion less deference. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (finding that treating physician's opinions were not entitled to controlling weight because they were not supported by substantial evidence in the record).

---

[5] 20 C.F.R. § 416.927 was amended effective March 27, 2017, and the revisions apply to all claims filed before that date. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5844, 5880–81 (Jan. 18, 2017). Other than the definition of "treating source" the new regulation remains substantially the same for claims filed before March 27, 2017. *Compare* 20 C.F.R. § 416.927 (version effective Aug. 24, 2012, to Mar. 26, 2017), *with id.* § 416.927 (version effective Mar. 27, 2017). For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 416.920c now apply.

If the ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given. 20 C.F.R. § 416.927(c)(2)-(6); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). These factors include (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency with the record as a whole; (5) the specialization of the treating physician; and (6) other factors that are brought to the attention of the Court. 20 C.F.R. § 416.927(c)(2)-(6). "[T]o override the opinion of the treating physician . . . the ALJ must explicitly consider" the foregoing factors. *Greek*, 802 F.3d at 375 (alteration in original) (quoting *Selian*, 708 F.3d at 418).

Although the Second Circuit does not require "slavish recitation of each and every factor," the ALJ's "reasoning and adherence to the regulation" must be clear from her opinion. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013); *see also Greek*, 802 F.3d at 375 ("The failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." (quoting *Burgess*, 537 F.3d at 129)); *Schaal*, 134 F.3d at 504 (finding that an ALJ's treating physician analysis was flawed when the ALJ "failed to consider all of the factors cited in the regulations").

Here, ALJ Friedman accorded "little weight" to the October 23, 2013 Impairment Questionnaire, which, he remarked, "would prevent all work." (R. 37). In so doing, he noted that the questionnaire was "completed by a Social Worker (not a physician)." (*Id.*) Although this statement was accurate because the questionnaire was completed by LCSW Cortes, the ALJ failed to recognize that Dr. Pierre, Plaintiff's treating psychiatrist, co-signed the questionnaire. Plaintiff argues that this failure constituted legal error. (Docket No. 10 at 10). The Court agrees.

Only "acceptable medical sources" can be considered treating sources whose opinions are entitled to controlling weight. *See* 20 C.F.R. § 416.927(c). As a licensed clinical social worker, Mr. Cortes is not considered an "acceptable medical source" under 20 C.F.R. § 416.902 and Social Security Ruling ("SSR") 06-03p. Accordingly, the legal standards for weighing opinions from a treating physician, such as Dr. Pierre, are different than those for weighing opinions from a treating LCSW, such as Mr. Cortes. *See Kohler v. Astrue*, 546 F.3d 260, 268–69 (2d Cir. 2008) (holding that opinions from medical professionals who are not "treating sources" under the regulations are entitled to "some consideration" but are not entitled to controlling weight).

"Reports co-signed by a treating physician may be evaluated as having been the treating physician's opinion." *Beckers v. Colvin*, 38 F. Supp. 3d 362, 372 (W.D.N.Y. 2014); *see also King v. Colvin*, 128 F. Supp. 3d 421, 436 n.14 (D. Mass. 2015) ("Where a treating acceptable medical source co-signs a non-acceptable medical treating source's opinion, the resulting opinion constitutes that of both sources."); *Payne v. Astrue*, No. 3:10-cv-1565 (JCH), 2011 WL 2471288, at *5 (D. Conn. June 21, 2011) ("The physician's signature on these opinions would appear to indicate that they are the opinions of appropriate medical sources.").[6]

It is unclear from the ALJ's discussion of the questionnaire whether he considered Dr. Pierre's co-signature. "The point is significant because of the consideration a treating physician's opinion is entitled to." *VanGorden v. Astrue*, No. 3:11-cv-1044 (GLS), 2013 WL 420761, at *2 (N.D.N.Y. Feb. 1, 2013) (remanding where ALJ failed to explicitly consider treating psychiatrist's co-signature on questionnaire completed by LCSW); *see also Lewis v.*

---

[6] Notably, this "is not a case in which there is no evidence that the co-signing psychiatrist ever personally examined the plaintiff or had an ongoing treatment or a physician-patient relationship." *Griffin v. Colvin*, No. 3:15 CV 105(JGM), 2016 WL 912164, at *14 (D. Conn. Mar. 7, 2016). To the contrary, it seems Dr. Pierre was involved with Plaintiff's treatment over the course of several years. (R. 407, 507, 569, 578, 581, 621, 707, 712).

*Colvin*, No. 12-cv-01317 (WGY), 2014 WL 6687484, at *5 (N.D.N.Y. Nov. 25, 2014) (same).

"In the absence of such a discussion, the Court cannot determine whether the ALJ properly

considered the co-signed opinion, and assigned the appropriate weight thereto." *Baldwin v.*

*Colvin*, No. 3:15 CV 1462 (JGM), 2016 WL 7018520, at *10 (D. Conn. Dec. 1, 2016)

(remanding with instructions to "explicitly consider the treating physician factors").

      The Commissioner argues that, even if the ALJ overlooked Dr. Pierre's co-signature, "the

ALJ's reasons for discounting this evidence are nevertheless valid." (Docket No. 18 at 18). To

give Dr. Pierre's opinion less than controlling weight, the ALJ needed to consider the factors

outlined in 20 C.F.R. § 416.927(c) and to provide "good reasons" for the weight given. The ALJ

stated that he accorded the questionnaire little weight because "it is internally inconsistent and

inconsistent with the weight of the evidence showing mild-to-moderate symptomology." (R. 37).

In particular, the ALJ identified two supposed inconsistencies: (1) the questionnaire assigned

Plaintiff "a consistent GAF score of 60, indicating only moderate, almost mild, symptoms" and

(2) the questionnaire indicated that Plaintiff was "capable of low stress work." (*Id.*)

      In light of the ALJ's failure to acknowledge Dr. Pierre's co-signature, these two supposed

inconsistencies, by themselves and without more elaboration, do not sufficiently explain the

ALJ's decision to accord "little weight" to the questionnaire. First, recent decisions in this

District have recognized that "the GAF is a less useful metric than some earlier cases report."[7]

*Tilles v. Comm'r of Soc. Sec.*, No. 13-CV-6743 (JPO), 2015 WL 1454919, at *33 (S.D.N.Y. Mar.

---

[7] "The use of GAF scores was discontinued in the current edition of the [Diagnostic and Statistical Manual of Mental Disorders], known as the DSM-V, which was published in 2013." *Gomez v. Comm'r of Soc. Sec.*, No. 15-CV-00013 (BCM), 2017 WL 1194506, at *20 (S.D.N.Y. Mar. 30, 2017). "Also in 2013, the SSA issued a bulletin limiting the use of GAF scores in disability proceedings, noting that 'there is no way to standardize measurement and evaluation.'" *Id.* (quoting SSA Message 13066, July 22, 2013). The SSA has also stated in its guidelines that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 FR 50746–01, at *50764–65 (2000).

31, 2015); *see also Maldonado v. Colvin*, No. 15 Civ. 4016 (HBP), 2017 WL 775829, at *18 n.17 (S.D.N.Y. Feb. 28, 2017) (noting that "[a] GAF score is of limited value"); *Gonzalez v. Colvin*, No. 15 Civ. 5011 (KPF), 2016 WL 6780000, at *10 n.10 (S.D.N.Y. Nov. 16, 2016) ("[T]he utility of this metric is debatable, particularly after its exclusion from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." (quoting *Otanez v. Colvin*, No. 14 Civ. 8184 (KPF), 2016 WL 128215, at *12 n.8 (S.D.N.Y. Jan. 12, 2016)); *Washington v. Colvin*, No. 13CV1264 (CM)(DCF), 2015 WL 920995, at *23 (S.D.N.Y. Feb. 24, 2015) ("[E]ven assuming that it was proper for the ALJ to have considered Plaintiff's GAF score in making his RFC determination . . . the ALJ should not have used such a score to supplant the tester's more negative findings."); *Restuccia v. Colvin*, No. 13 Civ. 3294(RMB), 2014 WL 4739318, at *8 (S.D.N.Y. Sept. 22, 2014) (holding that the ALJ erred by finding a treating medical source's opinions on mental disability inconsistent with GAF scores of 60 to 65).

Second, the fact that the questionnaire indicates that Plaintiff can tolerate low stress, (R. 594), does not mean that Plaintiff is not disabled due to other mental limitations. *See Futrell v. Colvin*, No. 4:13cv25, 2014 WL 119288, at *14 (E.D. Va. Jan. 10, 2014) (rejecting same reasoning by an ALJ because "[i]t is possible to answer affirmatively that Plaintiff can tolerate low work stress, but also find that she cannot complete a normal eight-hour day for other reasons"); *Rodriguez v. Colvin*, No. 13cv07607 (DF), 2015 WL 1903146, at *22 (S.D.N.Y. Mar. 31, 2015) (rejecting similar reasoning by an ALJ because "[t]here is no inconsistency apparent" between questionnaire indicating that plaintiff could tolerate only "low stress" and "opinion that Plaintiff would likely be prone to absences, if placed in a work setting").

Moreover, the ALJ did not explicitly address the other factors he was required to consider, "nor can the Court glean how the ALJ viewed these other factors based on his

18

decision." *Brown v. Colvin*, No. 16-cv-03193 (ALC), 2017 WL 3822891, at *9 (S.D.N.Y. Aug. 31, 2017); *see also Greek*, 802 F.3d at 376 (remanding where ALJ did not explicitly consider factors); *Rodriguez*, 2015 WL 1903146, at *20 ("Even if there were certain inconsistencies within the doctor's questionnaire . . . the ALJ was not permitted—as he effectively did here—to reject this treater's opinions entirely, without first considering all of the factors set forth in 20 CFR § 416.927." (citing SSR 96–2p)). For example, the ALJ did not discuss the length and nature of the treatment relationship—Dr. Pierre treated Plaintiff since at least August 24, 2011. (R. 398). Nor did the ALJ discuss the specialization of the treating physician—as a psychiatrist, Dr. Pierre provided opinions in his area of specialty. Indeed, the ALJ's decision does not once mention Dr. Pierre by name even though Dr. Pierre was Plaintiff's treating psychiatrist at the time of the hearing and for nearly three years prior. Because the ALJ failed to apply the correct legal principles in evaluating the medical evidence, the Court finds that remand is appropriate. *See Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) ("Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987))).

On remand, the ALJ should evaluate the October 23, 2013 Impairment Questionnaire in accordance with the treating source rule. "The ALJ should of course also consider the evidence that was presented to the Appeals Council when he considers this case on remand, to the extent it bears on the disability determination." *Marinez v. Comm'r of Soc. Sec.*, No. 16 Civ. 3243 (GWG), 2017 WL 4023319, at *8 (S.D.N.Y. Sept. 12, 2017); *see also Greek*, 802 F.3d at 372 n.1 ("On remand . . . the ALJ should, of course, consider Dr. Arshad's medical opinion because the Appeals Council added that opinion to the record.").

**D. The ALJ's Evaluation of Plaintiff's Credibility**

Plaintiff also argues that the ALJ improperly evaluated her credibility. Specifically, Plaintiff argues that the ALJ (1) failed "to consider all the factors in SSR 96-7p when evaluating Plaintiff's credibility," and (2) "applied the wrong legal standard by finding [Plaintiff's] testimony not credible only to the extent it conflicted with his RFC finding." (Docket No. 10 at 18–19). Because the Court concludes that the ALJ did not follow the treating source rule and remands on that basis, the Court need not reach Plaintiff's other arguments. The Court will, however, discuss Plaintiff's credibility argument because it raises concerns that may warrant consideration on remand.

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). It is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). Where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal." *Selian*, 708 F.3d at 420. Therefore, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. *Genier*, 606 F.3d at 49; *see also* 20 C.F.R. § 416.929. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. *Id.* If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. *Id.*

In the instant case, the ALJ applied the two step analysis. First, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. 34). Second, the ALJ determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (*Id.*). The ALJ did not entirely discredit Plaintiff's subjective complaints. Instead, the ALJ found them credible insofar as Plaintiff was limited to simple, routine and repetitive tasks and she could have only occasional interaction with coworkers and supervisors and contact with the public only two to four times a day.

In evaluating the credibility of Plaintiff's complaints, the ALJ contrasted Plaintiff's testimony with her treatment history and the medical reports in the record, and he provided a detailed discussion of the evidence. (R. 33–38). For example, the ALJ noted that Plaintiff's symptoms of depression and anxiety were largely situational and grief-related because she experienced significant losses. (R. 37; referring to R. 494, 563, 570). In addition, Plaintiff reported that medication helped her symptoms and that she was able to control her symptoms of anxiety and calm herself. (R. 628, 629, 633, 649, 650). *See* 20 C.F.R. § 416.929(c)(3)(iv).

The ALJ pointed out that progress notes reported that Plaintiff denied mood symptoms even when she was not taking medications. (R. 37, 510). The ALJ also considered Plaintiff's functional abilities and activities of daily living, such as her ability to independently care for her personal needs, perform household chores, cook and manage money. (R. 396, 412). In addition, Plaintiff described her memory and concentration as "ok." (R. 396). She did not have difficulty socializing, she was not afraid to meet new people, and she felt comfortable asking for assistance when needed. (R. 396). She did not have difficulty traveling or using public transportation. (R. 396, 412). *See* 20 C.F.R. § 416.929(c)(3)(i). Thus, the ALJ gave specific reasons for his credibility determination, which he supported with evidence from the record.

Plaintiff claims that it was erroneous for the ALJ to find that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ALJ's own RFC assessment. (Docket No. 10 at 18–19). Plaintiff correctly asserts that the boilerplate language used by ALJ Friedman has received extensive criticism from courts in the Second Circuit and elsewhere. *See, e.g., Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *17 (S.D.N.Y. Mar. 27, 2014). As the Seventh Circuit has noted, this language "gets things backwards" because "the passage implies that ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).

However, "this boilerplate language does not automatically require remand if the ALJ has otherwise adequately engaged in a credibility analysis." *Sylcox v. Colvin*, No. 14 Civ. 2161(PAC)(HBP), 2015 WL 5439182, at *15 (S.D.N.Y. Sept. 15, 2015). Indeed, courts within the Second Circuit have affirmed decisions containing the same boilerplate language. *See, e.g., Lewis v. Colvin*, 548 F. App'x 675, 678 n.7 (2d Cir. 2013); *Campbell v. Astrue*, 465 F. App'x 4,

7 (2d Cir. 2012); *Gonzalez v. Colvin*, No. 14-CV-06206 (SN), 2015 WL 1514972, at *20 (S.D.N.Y. Apr. 1, 2015).

In the instant case, the ALJ offered reasons for discrediting Plaintiff's testimony that were grounded in objective medical evidence. The Court thus finds that the ALJ conducted a legally sufficient analysis of Plaintiff's credibility. However, if the ALJ determines on remand that the opinions of Dr. Pierre are entitled to greater weight, then the ALJ will need to re-evaluate Plaintiff's credibility in light of the weight accorded to those opinions. *See Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 78 n.5 (2d Cir. 2012) (directing ALJ to re-assess his credibility determination on remand after finding that ALJ failed to follow treating physician rule). Also on remand, the ALJ should be careful to determine Plaintiff's credibility before, and independently from, the RFC determination.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied. The case is remanded to the Commissioner for further administrative proceedings consistent with this decision. The Clerk is respectfully requested to terminate the pending motions (Docket Nos. 9, 17) and close the case.

Dated:    October 5, 2017
          White Plains, New York

SO ORDERED:

_____
JUDITH C. McCARTHY
United States Magistrate Judge